Good morning. I'm John Bata. I represent the defendants. The bankruptcy court's analysis of the rights of the parties to the proceeds of the sale of the property in question started from the conclusion that the parties intended to share those proceeds equally. It is fundamental Arizona law, however, that the intent of the parties is to be ascertained from the ordinary meaning of the words of their contract unless those words are susceptible to more than one interpretation. The intent of the parties based on the words they used and whether those words are susceptible to more than one interpretation are both questions of law that this court determines de novo. The operating agreement in this case is a detailed, expertly drawn contract, not just some cocktail napkin scribbling. It includes a comprehensive integration clause that says that it is the final and only agreement between the parties and supersedes everything that came before. The operating agreement is susceptible to only one interpretation, and that is that the Ratliffs were entitled to payment for the fair market value of the land that they put into the company before sharing distributions equally with the Campbells, and the Campbells were entitled to recover their cash also before distributions were shared equally. The bankruptcy court's finding concerning the intent of the parties is therefore an error of law, and it formed the basis for the bankruptcy court's determination. You're urging us to disregard every indication of what the parties intended in favor of language which you say points to a different result. I'm saying that yes or no. No. Okay. Yes. That's the problem. Yes or no. That may be the problem, because I hear your argument, and it seems to me everything about this deal screams out 50-50, and you're telling us, but it wasn't, because you have to look at the language of the agreement, exclude all extrinsic evidence, and so I want to see if you really mean that proposition. If all the extrinsic evidence points toward 50-50, you're telling us it doesn't matter, the language of the contract dictates something else, and that's what rules. Is that your position? That is my position, and that's also very clearly the law in Arizona. And it goes to this question, these terms are a little bit amorphous, or not amorphous, but you say intent, what the parties intended, and if you're asking what was on their minds, subjectively on their minds, what they were thinking, that sense of intent, that's what that evidence goes to. And not just what they were thinking in anticipation, ask how they behaved later. Absolutely. But if you're asking what their contractual intent was, what intent is it to which Arizona law gives legal effect, the only intent that Arizona law gives legal intent when the contract is as clear as the one in this case, is the intent expressed by the words of the contract. Well, let me stop. It seems to me that the district court, and to some degree the briefs, mixed and matched concepts. So you can have a 50-50 partnership, but as I read this agreement, there's two aspects to that. One is when you come to the end of the road and the property is sold, you have a return of capital, but then you also have proceeds in excess if things go well. So you could have a 50-50 partnership in which you each share 50-50 in the proceeds, but isn't that question separate from how your return of capital might be valued? Yes. I think the answer to that is yes. If by return of proceeds you mean profits, you mean revenues in excess of capital. Correct. And that's the crux of this contract, is in this contract the parties clearly agreed to divide profits equally, but they did not agree, they expressly and unambiguously did not agree to share in each other's capital. Okay, so now let's assume, let's go down that road that says, well capital must be returned according to the contract, according to what's the fair market capital of the property you contributed. Do you agree with that's what the contract says? Yes, that's our contention. Okay. And one way to read the lower court ruling is to say, well, okay, I'm trying to figure out what is the fair market value of that parcel as of June 2005, which is when we have the official contract, correct? The contribution, yes. Contribution. And that's the time when the contract becomes effective. And one of the things the judge says, well, there's different things I could look at to figure out what the fair market value is. I could look at the original sale, which was a year before, and that's always good evidence. A real sale is good evidence. So that's the $400,000. But I throw out the accountant because he's not really an appraiser, so I can't really use his testimony. So my question then becomes what does the district court have in terms of what, or the bankruptcy court in terms of what it views as admissible evidence of fair market value? Well, the bankruptcy court has the actual contemporaneous sale of the property for $3.5 million within a matter of weeks, three weeks, after the valuation date. Now, it's true that that sale included irrigation equipment. Correct. But the disparity between the valuation of the property at $427,000 by the bankruptcy court versus the actual sale at $3.5 million is so great that we think that meets the implausibility standard. So then, though, did you affirmatively put evidence in the record that says, well, it's 3 point blank million, but, in fact, there's this equitable setoff or the value of the property actually, if you take out the irrigation and putting a value on that, not only the capital contribution of the irrigation but some increase in value of the property, it's therefore 3 point blank million minus X. Was there testimony to that? No. The Ralliser trial relied on the actual contemporaneous sale itself. Right. Without testimony interpreting. So, you see, what my point is, and one thing I am having trouble with this case is that I take your point that there's a difference between splitting the profits and getting your capital back. But when the court is left with, well, how do I define fair market value? What is the fair market value? The only evidence the court has is the $400,000, plus he has a sale that isn't actually the same property that was contributed. So was it incumbent on the court to somehow say, well, it's really 3 minus some number, or is that the burden of the person who's trying to establish what fair market value is, which is your client? Well, I respectfully disagree with the premise, the last premise stated in your question with regard to the allocation of the burden of proof. Oh, really? Where I think the burden of proof lay in this case, remember the Campbells were the plaintiffs. And the plaintiffs came in and they said that with taking into account the payment to Wells Fargo, you got too much money. So it was incumbent on them to present admissible evidence that we got too much money. And then the Rattlers came back and said, well, actually the farm was worth so much that we didn't get enough money. And so it was incumbent on the Rattlers to prove that. That's what they said in court, but that's not actually what they said before. But they came in before and said, well, I'm entitled to a commission, I'm entitled to these other expenses. Was there any articulation by the Rattlers prior to the trial of this theory that, well, we're entitled to recover the fair market value as of this date and that turns out to be all the profit or all the money, all the proceeds? Did they ever say that before they got to court? Well, we're not saying on this. Try once again. Did they ever say that before they got to court? I'm sorry, Your Honor. The answer to your question is not insofar as I'm aware. But that's not, it's commonplace for parties to bounce along in their transactions according to some notion of what they're about. What they thought the deal was, which turns out to be different from what they argue in court what the deal is. Well, what the deal is under Arizona law, this gets back to our earlier conversation, under Arizona law, the deal is what they agreed to in writing. I want to reserve some time. I have another question, a set of questions to pose to you, so I might take you a little longer. What I can't figure out about this case is why wasn't the problem solved with the money subsequently paid by N.K.? I mean, what I find in the record is that the next four quarterly payments after the proceeds are paid to Wells Fargo, the next quarterly payments are divided evenly and then I can't find anything happens after that. It seemed to me there should have been enough money coming from N.K. to solve these problems. Well, what happened was that before the next annual payment, there were quarterly payments of interest that were shared equally. Before the next annual payment of principal, the large payment, $450,000, came, the Campbells sued, and they sought to take over the money, and the parties then stipulated, without reserving all their rights, that the remaining payments would be divided equally. And so that's what happened. Was that responsive to your question? It brings me to another question. Suppose for the moment, I'm not persuaded by your primary proposition, that is that your client's entitled to what you describe as the fair market value. We still get the conversion problem, and you've argued there is no conversion because Wells Fargo is entitled to the money. And if I accept that, then I start wondering, well, what happens to the money that's due after Wells Fargo is paid? Shouldn't that wind up going back more to the Campbells to make up for the fact that the Rattlers got the benefit of the money paid over to Wells Fargo? And I can't figure out what happened to that money. Well, you could make an argument that the Campbells were entitled to a larger share of the subsequent payments, assuming that all proceeds were to be divided equally, notwithstanding the clear provisions of the contract to the contrary. But, I mean, you create an entire set of arguments that even if you lose on the first issue, your client's not responsible for conversion, but maybe he is if the subsequent payments aren't made benefiting the Campbells. But that would be a conversion of the subsequent payments. And the allegation, there was never an allegation in the case that the subsequent payments were converted. The only allegation and the only finding of the bankruptcy court was that the payment to Wells Fargo represented a conversion of the funds. The 300 and some thousand? Yeah. Okay, but let me ask you, what in your view is the fair market value of your client's contribution as of June 2005? My view is that it is much more than 427,000. What amount? I can't give you, the record doesn't allow me to give you an amount. That was a judgment that the bankruptcy court had to make. Well, but see, the difficulty is if we take your position, I mean, you're dancing around between your accountant and everything else. If the contemporaneous sale, I don't know, a little bit after that is 3.5 million, why isn't the amount, why wouldn't you say 3.5 million? Well, it was provided by the irrigation equipment, $700,000. Okay, we'll take a haircut for that. So now it's 2.8 million. Well, again, I think that the entrepreneurs who put in the irrigation equipment would have expected some profit from that. But I don't have to show in this case to secure reversal in my view that there was a specific amount. Both of you put in expert testimony, but the bankruptcy court wasn't happy with either one of your experts. They were very well qualified as CPAs, but they weren't qualified as land appraisers. Why didn't you come forward with a land appraiser who said as of June 2005 in Cochise County, there had been a substantial increase in the value of agricultural property, irrespective of whether you had a pivot irrigation system or not. And the value of this, you know, 1,000-acre parcel in June of 2005, in my opinion, would have been, and give us a figure, some place between 400,000 and 3.5 million. You're asking why that didn't occur? Right. On either side. Well, the answer is I think that on my side, counsel who tried the case thought that the actual contemporaneous sale was such compelling evidence of a high value for that property, given that the irrigation equipment. And your answer to Judge McEwen's question is 3.5 million. Yeah, it can't be some number north of 400,000, but I don't know the number. It has to be that the evidence showed 3.5 million is the number. The bankruptcy court disregarded that, shouldn't have kicked out my expert. In valuation trials, the trier of facts is not required to accept either party's valuation. The fact that it didn't accept our valuation didn't warrant it basing its valuation on a sale that was so old that... But you know what the bankruptcy court said is, look, I can only deal with the cards you guys dealt me. And I'm looking at the evidence, and here's what the bankruptcy court said. In the end, the only value I can come up with that seems to meet fair market value, because I don't like these experts and I don't know this whole thing about the irrigation, is the original purchase price. And so he landed on that. But the original purchase price was not evidence of value as of the valuation date, because there was, as everybody knows from the last few years... Well, as everybody, whichever way land went, a sale of the actual property 16 months ago is not evidence of the value today without further evidence. But the only evidence that was put in the record was the original purchase price and the sale price after the cap transaction, after the cap donations had taken place. And those are very, there's a substantial gap between those two. And the bankruptcy court was left with choosing between those two, and no experts testifying as to anything in between those. But it wasn't forced to a choice between those. It could have exercised its judgment on whatever basis it thought was appropriate, and the Rantlers were entitled to have that. Well, I think it did. It said, you know what, I've got this, and the only evidence that I find, I, the court, by incredible, he has a sentence in there, to define fair market value is that original number. And that original number is supported by how people treated it, how the accountants, the Quinoa memo and other things. But that judgment, forming the judgment as to what I find credible was driven by the error of law concerning the intent of the parties, by the error of law concerning the significance of tax bases as reflecting fair market value, and by the, by what I think is an error of law concerning the meaning of fair market value. Because the point was to search, to figure out what the property was going to sell for in June of 2005 without the irrigation equipment. I think we have your points in mind, and you've used up all your time, and then some. But I'm going to give you some time for rebuttal, so don't worry about that. I'm sorry? I'm giving you some time for rebuttal. Thank you so much. Good morning, may it please the court. Rob Charles from Lewis & Broca with my colleague Jeff Sklar on behalf of Stephanie McRae and Todd Campbell, Cochise Agricultural Products. Could you speak up just a little bit louder? Yes, and I apologize. Usually I'm too loud, and mics cause me to be quiet. So there are students here who will tell you I yell at them during class. And your questions point out the difference between these two appeals so graphically, because we're talking about after a five-day bench trial, the bankruptcy court made findings of fact which we are told are now clearly erroneous. Well, let's start right there. One of the things that concerns me from your point of view is the contract says fair market value. That has a customary meaning in commercial law, and particularly in real estate law. And why wasn't it error for the court to go off on intent of the parties when you have an unambiguous contract? Because our respectful view and why there isn't appraisal testimony is that that's really not the issue that we thought the bankruptcy court was dealing with. The parties had books and records. CAP had books and records that reflected fair market value. That information had been given by Mr. Ratliff to the CPA, and those books and records were just fine. They reflected the agreement of the parties. And our primary concern with this whole line is that the contract is being interpreted now to say what we should do is have a judge decide fair market value someday, based upon whatever standard the judge uses, and that's what will be fair market value for our deal. That's not at all what the parties understood. No, but what does the contract say? The contract says that you get your capital back based on fair market value, correct? Yes. Okay. Do we agree that fair market value should be valued as of June 2005? No. What date? The date that the parties reached agreement, which was the summer of 2004. But the bankruptcy court already threw that out and said there was no enforceable agreement of that date. I understand. So unless that's an error of fact, it seems that June 2005 is the date on which the deal came together in a legal sense. No, it doesn't say. There's no word. That's the implication. No, but no word does it say appraisers. It says fair market value. Agreed. Okay. So as of June 2005, if you have to determine the fair market value as of June 2005 is what a willing buyer would pay and a willing seller would sell. I disagree with that. Now you're reading something into the contract that's not there. Do you disagree with the commercial definition of fair market value? As if that that was interpolated into this contract given all the other evidence I do. Because your question implies a parenthesis after fair market value as determined by this definition and by an appraiser. Fair market value. They mean these numbers. These numbers that are in our books and records. They can agree. Where do you get that? I mean, give me your best case for that. Because after years of sitting up here and years of being in private practice, most people pretty much knew what fair market value is. Agreed. And when a court interprets a contract, if you have a term like that which has an ordinary and customary meaning in the commercial world, that's how it's interpreted. So what is your best case to say forget the ordinary meaning. We want you to have our special meaning. It's not a special meaning and there is no case. It's about facts. If I had agreed to sell you my car in an integrated written document for fair market value, we sign integration clause, we put blood on it so that it's no extrinsic evidence. And then ten days later you pay me dollars and I take the dollars and give you the title. And then outside the limitations period, by the way, of the applicable law, in comes the reformation action to say I want a lot more money from you. Because our contract was fair market value. And although we agreed on what the price was and you paid it, that's not what our contract is. Our contract is fair market value as determined by an appraisal standard and then informed by whatever evidence would be admissible on that standard. That's a completely different thing because you have a completed transaction here. According to the bankruptcy court, you have a contract in June 2005 and that's the starting point. That's a factual determination made as to when that comes into being. And then you look at fair market value. If the bankruptcy court is looking at fair market value and even if it takes your point that you can look at the party's intent, what do you think is the best evidence in your view of the party's intent as of June 2005? Remember that the operating agreement is in February. So what you have is taking words from February to June. Take the evidence after June as course of performance to make it easier. Because when you're talking about a traditional parole evidence rule case, you're talking about a fight about evidence before the contract is formed. What you have here in addition to that, none of which is disputed, is course of performance. The parties after June, consistent with the idea that it wasn't $2.5 million. And it was basically your equity in the land as you acquired it. The parties split the proceeds that came out equally, except for the diversion. The parties prepared books and records, which were then turned into K-1s on tax returns, which were then provided to the parties to prepare their own tax returns. And when Mr. Ratliff took the money, he knew he couldn't. It's not that he thought, I have a $2.5 million credit, and it's okay for me to take the money. He said, Ratliff Farms owes. I want to be reimbursed something for my land prep costs and later a commission and whatever the theory of the moment is. But all of that course of performance tells you they knew what fair market value was. And they knew it was the numbers that were in their books and records. So do you believe there's evidence in the record that shows between this initial kind of handshake agreement and the transfer of the property to this corporation entity in 2005 that there was, is there evidence that shows there was an increase in the value of the land? No. There's no evidence in either respect. Your data points, to go to Judge Bivey's question, your data points on value, if we say that that's the determination that must be made, is fair market value. And if we say it's even as of June, the only data points you have are sale of the property to the Ratliffs the year before, the closed sale, Mr. Ratliff saying essentially owner's opinion of value, which the judge also considered and discounts, and then the two accountants who were credible on lots of other issues, but when they tried for valuation, the judge said no. And so even if you have to determine fair market value, he did. He looked at the evidence and he said here is the evidence upon which I make that conclusion. But he's comforted by the fact that it's still within the parameters of what everybody in this room knows the party thought was the agreement, Do you agree with the proposition that even though there was an intent to have a 50-50 partnership, that the written contract controls as to the value of the capital contribution return? No. Why not? A couple of reasons. Because the initial contributions piece of the contract says what it says. And because as the parties were... And what does it say? Is that the $500? Right, the teeny little bits. But nobody threw in $500 actually. I don't know, probably not. It's sort of like for $1. You never have the real dollar. But if you use fair market value there, again, and you say that is what controls and that that's a new understanding, that reflects something different than the parties had understood before, then you're back in the question that we've just been discussing, which is, well, what did they think fair market value was? Books and records tell you. And if you won't accept the parties' agreement as to what fair market value was, will you accept the bankruptcy court's finding of fact based upon the evidence that was presented to him? But to say pick some arbitrary number between those other data points, if the judge had done that, I might be arguing as the appellant, but I am not. He had what he had in front of him. It seemed that he said the only real data point he had was the original sale. He didn't credit the post-June 205 sale as being evidence of either intent or fair market value. Well, he certainly was aware of it. But as your question pointed out, you've moved from raw land. The testimony was essentially it was desert in southeastern Arizona when the Ratliffs acquired it. And now it's improved land that's being sold as an operating farm, and Mr. Ratliff and his brother are requesting reimbursement for money that they put into that process, in addition to the pivot agricultural system and the other things that are discussed in the brief. And so the judge found that that concluded sale isn't the evidence that he would make his determination on, and that's why we have trier's effect. I would have thought they would have come in and said if it's fair market value, then it should be 3.5 minus something. But they didn't say that. You heard the argument. So the question I have, too, is when you boil all this down, how much money remained in dispute? Well, let me answer the question I think in the way that perhaps Judge Clifton asked it. How could it have been solved right then? I think it could have been solved right then when Mr. Ratliff took the first chunk and gave it to Wells Fargo, if he had instead paid half of that to the Campbells. But how could he? Because it was owed to Wells Fargo. He owed Wells Fargo. Not just he. I mean, Cap had put the proceeds up as collateral. And Mr. Ratliff did not pay. Not only that, no, but he did something else. And it might be a different case if Mr. Ratliff had not paid or if he'd split it equally or done something that caused Wells Fargo to exercise its remedies. But the intentional act that occurred here was Mr. Ratliff took the money that he controlled, the CAP money that he controlled, and he paid it to Wells Fargo. Wells Fargo did not exercise its collateral rights. The bankruptcy court says otherwise. The bankruptcy court says Wells Fargo demanded the proceeds and received the payoff, the sum of $358,000. It doesn't say that he, that Mr. Ratliff didn't intentionally make the payment, but the distinction I'm drawing between. Whether he, I mean, the bank sends me a credit card bill each month. They demand that money. I pay it. That doesn't mean it's my entirely voluntary act. I owe them the money. It is your voluntary act to make the payment out of the source of funds that you choose to make the payment. Well, if Wells Fargo has these proceeds as collateral. They have a lien on the land. So they have a legal obligation. In other words, the CAP has a legal obligation to pay Wells Fargo the $300,000, correct? No, CAP has granted that property as security for the Ratliff's legal obligation to pay the debt. Right. But that is sort of verbiage because if I'm the bank, I actually don't really care. You don't. I just know that I have a legal right to get paid with that as my collateral. But as between the partners, we care a lot. What should Ratliff have done? Split the proceeds from N.K. to the Campbells. And then made his payment to Wells Fargo, which wouldn't have been enough to make the payment. Wells Fargo would have then done what? He should get the rest of the money to make the payment. Well, he can't do that. The banks demanded this money because it has a hold on this money. For him not to pay the bank would breach an obligation not only of him but of CAP. But the difference between conversion and breach of contract is serious. And by the way, this is only about the dischargeability issue. None of this excuses. But the difference between breach of contract and conversion is the difference between an intentional act in violation of someone else's rights. His argument is I have an economic necessity to take your money. Your client gave permission. Your client was part of letting this be part of the pledge, part of the collateral. And so I have trouble seeing how his action in response to the bank's demand is somehow willful and malicious or a breach of fiduciary duty if in fact the bank was entitled to the money, which it was. Can we agree that if he had other funds and he had used CAP's money, that would have been conversion? No. I don't think we can agree that. Because it's the bank that's making the demand. We're not bargaining with you. He can take anyone's money that he wants. All right. So I'd still like an answer to my question. I will try. So if Ratliff had taken the payment from N.K., sent half of it over to the campus and said here's your share of the N.K. payment, taken his share and given it to Wells Fargo, which would have not satisfied Wells Fargo's debt, what would Wells Fargo have done at that point? It would have demanded from Ratliff Farms payment and it would have demanded from CAP payment or it would have enforced. And then what does CAP do? It says to Mr. Ratliff and Ratliff Farms pay this debt. And they don't have any money. Then we're in what I do for a living, which is dealing with debtors and creditors. Right. But at that point, then Wells Fargo has to go against CAP, right? It can. Okay. And does that mean it can go against the Campbells? I don't believe the Campbells guaranteed. It's a non-recourse. It's a pledge of CAP's property, but not a personal liability of my clients. Okay. So then they would have foreclosed on the property at that point? As I recall, they have, if not that, a right at the note, a right against N.K. So maybe garnishment, something like that. The money then would have been paid to the bank. Could have been. Could have been. Well, not could have been. First of all, the bank always comes out first. We know that, by and large. It has this lien. It's got $307,000 owed to it. Its recourse is back against the property deal and the sale, correct, if the money isn't true? It has that recourse. But, for example, the Wells Fargo, just like Western Bank, when the Western Bank obligation had been extended, you can work things out, particularly in the kinds of markets we had pre-2008. You can work things out. And so the assumption that the very worst would have happened, I don't think is a fair assumption supported by the record. I'm out of time, but I'd love to answer any more of your questions. We'd ask that you affirm the bankruptcy appellate panel. Thank you. Mr. Barr, if you can put two minutes on the clock for rebuttal. We've kind of taken both sides over the time. Thank you. Let me speak briefly to the discussion that you just had with my colleague. The argument that, the point is, if the CAP had not paid the money to Wells Fargo, that would have been a conversion of those funds as against Wells Fargo. And the two cases, Case Corporation and Sears Consumer Financial Corporation, that we cite in our papers, show that. They also show that whether Wells Fargo exercised its rights or not is irrelevant, because it had a property interest in that money ahead of the interest of the Campbells. Right, but of course their position is your client should have taken half the money, say to the Wells Fargo, here's half, and then out of my pocket here's the other half, which of course they don't have that money. But as far as Wells Fargo's property rights are concerned, Wells Fargo had a property right in the whole $350,000 that it received. Would it have been a conversion if in fact the Rattlers had other money, but decided instead to take this money and pay it over, the N.K. proceeds? Well, I don't know the answer to that question. I think the answer is it would have been a conversion as against Wells Fargo. Well, Wells Fargo gets paid. I'm saying here, suppose they take the N.K. proceeds and pay it to Wells Fargo and keep for themselves other money they could have used to pay Wells Fargo. Would that have been a conversion with regard to the Campbells? No, I don't think so, and the reason is that Wells Fargo had a senior property right in that money, and it might have been a breach of the contract, a breach of the operating agreement, not to use those other funds, but in terms of being the tort of conversion, the essence of which under Arizona law is being an offense against possession, Wells Fargo had the right to possession of that particular fund, and therefore I don't think it would have been a conversion. May I speak briefly to the merits? Well, no, you've used all your time. I'm going to give you just one last point. You've used all your two minutes. It is incorrect to say that the books of CAP reflected the fair market value. Those books were prepared on a tax basis. We understand that, and I think you've made that point in your brief as well. Thank you so much. Thank you. I'd like to thank both counsel for your argument this morning. The case of Ratliff versus the Cochise Agricultural Properties is submitted. We're now adjourned. We'll be back in about 30 seconds, and we will then entertain questions from students and faculty. Counsel are welcome to leave. You're also welcome to stay. All rise. This court, at this session, stands adjourned.
judges: McKeown, Clifton, Bybee